# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:17-CR-22 (MTT) |
| ) | |
| DELMA GODDARD, *et al.,* ) | |
| ) | |
| Defendants. ) | |
| ) | |

## ORDER

Defendant Delma Goddard has moved to suppress evidence obtained via wiretap. Doc. 306. Goddard has also moved to convene a *Franks* hearing.[1] *Id.* For the reasons stated herein, Goddard's motion and request for a *Franks* hearing are **DENIED**.

## I. BACKGROUND

On June 13, 2016, the Court authorized the first of three orders authorizing the Government to intercept telephone communications pursuant to an investigation into an alleged drug conspiracy. Doc. 314 at 2-3. Along with its application for the wiretap order, the Government submitted an affidavit by Harold L. Hurley, a special agent with the Drug Enforcement Administration with approximately nineteen years of combined law enforcement experience. *See generally* Doc. 306-2. As a result of this investigation, a grand jury indicted Goddard and 15 other defendants in a 60 count indictment on September 21, 2017.[2] Doc. 249. The Government charged Goddard with

---

[1] A *Franks* hearing is "[a] proceeding in which a defendant seeks to suppress evidence based on the falsity of an affiant's declaration." *Franks hearing*, Black's Law Dictionary (10th ed. 2014) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

[2] The September 21, 2017 indictment superseded a previous indictment entered on May 11, 2017, which included 51 counts. Doc. 1.

conspiracy to possess with intent to distribute cocaine base; conspiracy to distribute methamphetamine; distribution of cocaine base; distribution of methamphetamine; possession of firearms by a convicted felon; possessing firearms in furtherance of a drug trafficking crime; and distribution of heroin. Doc. 249.

Goddard now moves to suppress the evidence obtained pursuant to the wiretap orders, arguing that the initial June 13, 2016 application did not sufficiently establish necessity for the wiretaps.[3] *See generally* Doc. 306. Goddard filed his initial motion on November 25, 2017. Doc. 281. But that motion failed to specifically allege insufficiencies in the wiretap application, and, therefore, on December 13, 2017, the Court ordered Goddard to file an amended motion. Doc. 302 at 1-2. Goddard then filed an amended motion on December 20, 2017 to which the Government has responded. Docs. 306; 314.

## II. NECESSITY[4]

Goddard argues the Government's application did not establish necessity because (1) it failed to establish that investigative techniques already employed had failed and (2) it did not establish that law enforcement had exhausted all available

---

[3] Goddard's motion "focuses principally upon" the June 13, 2016 application and affidavit, stating that "[t]he other two applications at issue here repeat much of the evidence in the first affidavit" and any additional evidence in the latter applications was "discovered through the wiretap installed following the [first] warrant." Doc. 306 at 11 n.2. Thus, Goddard argues if the Court finds the initial application to be lacking, "it would excise the findings resulting from that wiretap outlined in the successive affidavits and applications . . . render[ing] these subsequent affidavits clearly defective." *Id.* Accordingly, because Goddard's arguments focus on the first application and he makes no distinct arguments as to the other two applications, the Court only discusses the initial June 13, 2016 application and accompanying affidavit.

[4] Goddard does not contest whether there was probable cause for the wiretaps. *See generally* Doc. 306. Defendant Deshawn Ransom filed a separate motion to suppress, which has been withdrawn but does challenge probable cause. Docs. 305; 322. Regardless, the Court notes the wiretap applications clearly show "the totality of the circumstances indicate that there is probable cause that the sought-for evidence will be obtained." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) (quotation marks and citation omitted); *see also Illinois v. Gates*, 462 U.S. 213, 214 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

-2-

investigative techniques.  *See generally* Doc. 306.  "The right of the people to be secure in their persons, houses, papers, and  effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be  seized." U.S. Const. amend. IV.  Any order authorizing wire interception must be supported by a Government affidavit swearing not only to probable cause but also to the necessity for  such order, shown with "a full and complete statement as to whether or not other  investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1).

Regarding necessity, "section 2518 does not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted; however, it does require the Government to show why alternative measures are inadequate for this particular investigation."  *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (quotation marks and citations omitted).  "The affidavit need not . . . show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves."  *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986).

Goddard first argues the wiretap was not necessary because other investigative methods had not actually failed but were successful in gathering evidence against him. Doc. 306 at 11-14.  Hurley acknowledges in his affidavit the Government was able to gain evidence from several investigative methods including physical surveillance, pen registers, confidential sources, consensual recordings, and tracking devices.  Doc. 306-2 at 81-89. But Hurley also stated that, although they were partially successful, because of their limitations, those investigative methods would be inadequate for the

goals of this particular investigation. *Id.*; *see Perez*, 661 F.3d at 581 ("The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary."). Hurley stated the goal of the investigation was not simply to gather information regarding Goddard's criminal activities but to reveal the "full scope and nature of the criminal activities" of the target Middle Georgia-based organization and its associates. Doc. 306-2 at 78. Specifically, Hurley testified:

> [I]t is your Affiant's belief that interception of wire communications is the only available technique that has a reasonable likelihood of accomplishing the objectives of this investigation, including identifying local wholesale distributors and members of their organization, determining the breadth of the Middle Georgia-based organization's operations, their method of acquisition and distribution of narcotics, specifically crack cocaine and crystal methamphetamine, the identify of their associates and co-conspirators, the nature and scope of their illegal activities, the relationship between financiers, transporters, suppliers, and distributors of the controlled substances, and the collection and distribution of monies which stem from the illegal drug activities and/or finance the illegal drug activities.

*Id.* at 76. In addition, in his affidavit, Hurley stated why the investigative methods used prior to the June 13, 2016 application could not achieve these goals.

First, Hurley testified that, although it had been used with limited success, physical surveillance was unlikely to establish conclusively the roles of target subjects or identify additional co-conspirators or the manner in which they conduct their daily drug distributions and trafficking activities. Doc. 306-2 at 79-81. According to Hurley, from his experience, higher ups in drug conspiracies rarely handle drugs, drug proceeds, and firearms, making it unlikely that physical surveillance would identify or procure evidence on these individuals. *Id.* Moreover, he stated that, because the community in which the criminal activity took place was "tight knit," making outsiders readily identifiable, it was not only difficult but also dangerous for law enforcement to infiltrate the area using physical surveillance. *Id.* at 79-80.

Law enforcement had also effectively used confidential sources to execute controlled buys of crack cocaine, crystal methamphetamine, and firearms, allowing agents to identify Goddard and other members of the criminal organization. *Id.* at 84. But Hurley testified "it is unlikely that [confidential sources] will be able to obtain the information necessary to reveal the interior workings of [the conspiracy]." *Id.* at 83. According to Hurley, because only a few individuals actually take part in firearms and drug transactions in an effort to protect the identify of higher ups, confidential sources, and controlled buys organized through use of confidential sources, would have limited success identifying sources and customers that conspired to possess and distribute narcotics and firearms. *Id.* at 84. Similarly, through the use of consensual recordings, agents gathered "valuable actionable intelligence," leading to controlled buys of narcotics and the identification of three co-conspirators. *Id.* at 85. But Hurley testified that, because consensual recordings are merely recorded conversations of undercover or confidential sources and are subject to the same limitations as those sources, they could not meet the objectives of this investigation. *Id.* at 85-86.

The investigation also used pen registers and tracking devices but with limited success. Id. at 81-82; 88. According to Hurley, drug trafficking organizations easily thwart the usefulness of pen registers by using telephones or cell phones with either no subscriber information or false information, and, therefore, pen registers do not provide sufficient information about either individuals or larger organizations. *Id.* at 81-82. Meanwhile, investigators attempted to use tracking devices on two target vehicles but both devices were found and removed. *Id.* at 88. And finally, Hurley testified that agents conducted a financial investigation but that investigation was, at the time of the application, in its initial stages and had not yet revealed evidence. *Id.* at 89.

With this testimony, the Government sufficiently stated that the investigative methods used prior to the wiretap application were not successful in gathering the evidence necessary to achieve the goals of this particular investigation. *See Perez*, 661 F.3d at 581.

Next, Goddard argues the Government did not exhaust other available investigative methods before turning to wiretaps. But contrary to Goddard's argument, the Government does not need to show a "comprehensive exhaustion of all possible investigative techniques." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010); *see also United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984). Rather, as the Government does here, it need only state with specificity why other investigative methods not yet used will fail and thus were not attempted. *United States v. Giordano*, 416 U.S. 505, 515 (1974), *superseded by statute on other grounds as stated in United States v. Anderson*, 39 F.3d 331, 339 n.6 (D.C. Cir. 1994); *Van Horn*, 789 F.2d at 1496; *United States v. Dennis*, 786 F.2d 1029, 1035 (11th Cir. 1986).

In his affidavit, Hurley stated why the following investigative techniques would fail and, thus, why they were not attempted prior to applying for a wiretap. Doc. 306-2 at 82-89. First, Hurley testified the use of grand jury and administrative subpoenas would not have been effective because all of the members of the organization had not been identified at that time, and, thus, the Government could not serve subpoenas on those individuals. Doc. 306-2 at 82. Hurley also stated that, even if investigators could have issued subpoenas, the members of the conspiracy were unlikely to cooperate without an offer of immunity, which would have "foreclose[d] prosecution of the most culpable members of [the] conspiracy," and the issuance of subpoenas could have alerted the members of the conspiracy to the investigation, compromising the investigation and endangering informants. *Id.* Further, Hurley testified that, from his experience,

members of drug conspiracies frequently give false information to cell service providers, which undermines the usefulness of issuing subpoenas to those cell service providers. *Id.* at 83.

Next, Hurley testified the Government could not have used undercover agents because of the "close-knit nature of the [conspiracy]." *Id.* at 85. Moreover, he stated the members of the organization were experienced, only dealt with long-term associates, and engaged in counter-intelligence tactics. *Id.* Accordingly, agents were unlikely to infiltrate the organization and, even if they had, it would have been difficult to gain information about the upper level members of the conspiracy. *Id.* Because the most knowledgeable targets, who could have given the most information, would have likely been uncooperative and informed their co-conspirators of the investigation, interviewing those individuals or issuing warrants for their arrest would not only have been unfruitful but could have compromised the investigation. *Id.* at 86. Moreover, Hurley stated agents had interviewed a cooperating gang member who had since disappeared, and, therefore, agents, at the time of the application, believed it was unlikely future gang members would be cooperative. *Id.* at 86-87.

Search warrants, according to Hurley, were also "unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identify of all the participants, and/or their methods of operation." *Id.* at 87. Hurley pointed out that, at that time, the investigation had only identified "four or five members" of the criminal organization and had "not yet identified all of the locations that they use[d] for storage/distribution of drug and drug proceeds within the Middle District of Georgia." *Id.* Hurley also stated that issuing and executing search warrants could have "tip[ped] off" investigative targets leading them to "curtail or conceal their activities and bring[ing] the investigation to an unsuccessful and premature conclusion." *Id.* As such, Hurley

testified that executing search warrants would have been more "productive . . . at the conclusion of the investigation" when the "goals of the investigation [were] substantially achieved." *Id.*

Finally, Hurley stated pole cameras and trash searches would not have been effective for purposes of this investigation. *Id.* at 87-89. According to Hurley, pole cameras would not have assisted in learning about the inner workings of a conspiracy, "such as the quantities and types of controlled substances involved." *Id.* at 87-88. And the layout of the neighborhood where the target activity primarily occurred made it difficult to install pole cameras "without jeopardizing the investigation and the safety of agents." *Id.* at 88. Similarly, trash searches would have been difficult to conduct because of the close-knit nature of the community and because the criminal organization monitored law enforcement activity "around the clock." *Id.* Moreover, trash searches would have been dangerous for agents, especially considering the drive-by shootings that occurred around that time. *Id.*

In sum, the Government, through Hurley's testimony, established the "prospective failure of several investigative techniques that reasonably suggest[ed] themselves." *Van Horn*, 789 F.2d at 1496. Moreover, because the Government also established that investigative techniques used prior to the application failed to achieve the goals of this investigation, the June 13, 2016 application sufficiently established the necessity for the wiretap order. And because Goddard's argument in his motion centers on his contention that the initial application was inadequate and that this invalidated the subsequent applications, the Court finds those applications were not insufficient either.

### III. *FRANKS* HEARING

In *Franks v. Delaware*, the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." 438 U.S. 154, 155-56 (1978). *Franks* requires an initial showing by the movant that is "more than conclusory." *Id*. at 171. Indeed, a defendant's allegations "must be accompanied by an offer of proof" and "point out specifically the portion of the warrant affidavit that is claimed to be false." *Id*. Goddard makes no such showing here. Accordingly, his request for a *Franks* hearing is **DENIED**.

## IV. CONCLUSION

For the reasons stated herein, Goddard's amended motion to suppress (Doc. 306) is **DENIED**, his initial motion to suppress (Doc. 281) is **DENIED as moot**, and his request for a Franks hearing is **DENIED**.[5]

**SO ORDERED,** this 22nd day of March, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT

---

[5] Defendants Derrick Mosley and Deshawn Ransom moved to adopt Goddard's initial motion to suppress. Docs. 288; 290. Ransom has since withdrawn his motion. Doc. 322. As stated, Goddard's initial motion was inadequate because it failed to specifically allege the insufficiencies in the wiretap application, and the Court ordered Goddard, as well as all those who sought to adopt that motion, to file an amended motion. Doc. 302. Goddard filed an amended motion on December 20, 2017 (Doc. 306), but Mosley filed nothing in response to the Court's order and did not move to adopt Goddard's amended motion. Accordingly, Mosley's motion to adopt Goddard's defective motion to suppress (Doc. 290) is **DENIED**.