# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CASE NO. 5:17-CR-22 (MTT) |
| | ) |
| Delma Goddard, a/k/a "SHUG", a/k/a "BIG HXMIE", *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

On May 11, 2017, a grand jury indicted Goddard and 15 other defendants in a 51 count indictment. Doc. 1.[1] Delma Goddard has moved to suppress statements he made in a custodial interview. Doc. 282. That motion is **DENIED**.

## I. FACTS

On May 23, 2017, Defendant Delma Goddard was arrested on charges of conspiracy to possess with intent to distribute cocaine base, conspiracy to distribute methamphetamine, distribution of cocaine base, distribution of methamphetamine, distribution of heroin, possession of heroin with intent to distribute, possession of a firearm by a convicted felon, and possessing a firearm in furtherance of a drug trafficking crime. Doc. 313 at 1. Upon his arrest, Goddard was taken to the Baldwin County Sheriff's Office in Milledgeville, Georgia. There he was interviewed by Drug Enforcement Administration Special Agent Harold Hurley and Federal Bureau of Investigation Special Agent Craig Pfeifler. Doc. 313 at 1. The 66-minute long interview

---

[1] The May 11, 2017 indictment was superseded by another indictment on September 21, 2017, which included 60 counts. Doc. 249.

took place in an interrogation room and was recorded with a video camera.[2] All relevant events were captured by the recording and neither party disputes the accuracy of the recording. Thus, the facts are undisputed, including the fact that Goddard was advised of his *Miranda* rights and that he acknowledged that he understood these rights. However, Goddard contends that his statements were involuntary. Specifically, he contends: (1) his statements were made in reliance on or were induced by an implied promise of leniency; (2) the agents deceived him about the evidence against him; (3) he was under the influence of pain medication at the time of the interview; and (4) the agents' aggressive questioning and tactics overbore his will to remain silent. *See generally* Doc. 326.

## II. DISCUSSION

Although it is undisputed that Goddard received and understood *Miranda* warnings prior to making any statements to Agents Hurley and Pfeiler,[3] "[t]he requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States,* 530 U.S. 428, 444 (2000). A suspect's will still may be overborne by the circumstances surrounding his custodial interrogation despite law enforcement authorities' adherence to the dictates of *Miranda*,

---

[2] The video runs 82 minutes, but Agent Hurley and Pfeiler's interview ended 66 minutes into the video. Doc. 323-2. The recording begins at the 14:44:19 mark (presumably 2:44 pm, although there was no evidence that the time stamp is accurate) and ends at the 16:05:45 mark. *Id.* At the February 14, 2018 suppression hearing, the recording of the interview was marked and admitted as Exhibit 2. Docs. 323; 323-2. However, only the part of the video played at the suppression hearing was admitted into evidence. *Id.* That part ran from the beginning to the 15:11:37 mark. Doc. 323. Both parties assured the Court they had introduced all of the interview they wanted the Court to consider. Nevertheless, the Court reviewed the entire video and nothing in the part not played at the hearing is inconsistent with the findings and conclusions in this Order. On the contrary, the remainder supports those findings and conclusions.

[3] After Hurley read Goddard his *Miranda* rights from a *Miranda* card and asked Goddard if he understood his rights, Goddard stated, "I understand." Doc. 323-2 at 14:46:40 – 14:47:00. The card used by Hurley was admitted into evidence at the February 14, 2018 Hearing. Docs. 323; 323-1.

but those cases are rare. *Id*. "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). And to find a statement to be voluntary, courts must "conclude that [the defendant] made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Moore v. Dugger*, 856 F.2d 129, 132 (11th Cir. 1988). In so finding, courts must address the totality of circumstances to determine if a statement or confession is voluntary including the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The inquiry focuses on whether there was police overreaching, and factors to consider include: (1) the accused's lack of education or low intelligence; (2) the lack of any advice to the accused of his constitutional rights; (3) the length of detention; (4) the repeated and prolonged nature of the questioning; (5) the use of physical punishment, such as deprivation of food or sleep; and (6) whether the police used any promises or inducements. *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996); *see also Mincey v. Arizona*, 437 U.S. 385, 398-99 (1978); *Purvis v. Dugger*, 932 F.2d 1413, 1421-23 (11th Cir. 1991).

**A.    Implied Promise**

The Eleventh Circuit has stated that "even a mild promise of leniency can undermine the voluntariness of a confession." *United States v. Ramirez*, No. 14-14689, 2018 WL 651454, at *8 (11th Cir. 2018) (quoting *Lall*, 607 F.3d at 1285). However, as the Eleventh Circuit acknowledged in *Lall*, the Supreme Court rejected the suggestion

that there is a "per se rule that would render a confession involuntary if it was preceded by any direct or implied promises, however slight." 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Arizona v. Fulminante*, 499 U.S. 279, 284-85 (1991)). Instead, the Eleventh Circuit said in *Lall*, "the issue of voluntariness must be determined by examining the totality of the circumstances." *Id.* (citing *Fulminante*, 499 U.S. at 284-85). And a significant aspect of that totality of the circumstances inquiry "involves the effect of deception in obtaining a confession." *Id.* Weighing heavily in this analysis is whether officers misrepresented the law or its effect. *Id.* (stating misrepresentations of law, as opposed to misrepresentations of fact, are "much more likely to render a suspect's confession involuntary"). Thus, any assurances given to defendants that misrepresent the law may render a confession involuntary. *See id.* For example, in *Lall*, the officer promised that he would not pursue charges, prompting the suspect to confess. *Id.* at 1283. Because this assurance contradicted the *Miranda* warnings that the suspect's statements could be used against him and, thus, misrepresented the law, the Eleventh Circuit found that, under the circumstances, the promise rendered the confession involuntary. *Id.* at 1287.

But the suggestion of a possibility of a cooperation agreement or informing a suspect that cooperation would be helpful, without a direct or implied promise of leniency, does not render a statement involuntary. *United States v. Mercer*, 541 F.3d 1070, 1075-76 (11th Cir. 2008); *see also United States v. Deal,* 438 F. App'x 807, 811 (11th Cir. 2011) (defendant's statement was not involuntary because an officer told the defendant "we might be able to straighten some of this out" in response to defendant's assertion of innocence and offered the defendant an opportunity to write a letter to the

prosecutor); *United States v. Graham,* 323 F. App'x 793, 800 (11th Cir. 2009) (law enforcement officer's statement that cooperating would benefit defendant did not make the defendant's statements the product of coercion); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.") (quoting *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978)); *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir.1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.").

Goddard "contends that he was offered a promise of hope for leniency" if he cooperated and that he "continued with the interrogation based on the assumption of an implied promise by Agent Hurley." Doc. 326 at 7. Specifically, and although Goddard did not testify,[4] he argues the video established that he assumed that the agents impliedly promised lenience. The Court disagrees. When the totality of the circumstances are considered, there were no statements made by either agent that could be construed as an implied promise of leniency or from which Goddard could

---

[4] A defendant may testify at a pre-trial suppression hearing without waiving his right not to testify at trial, and any statements made during such testimony may not be used to prove guilt in a subsequent trial. *United States v. Stricklin*, 591 F.2d 1112, 1118 (5th Cir. 1979) (relying on *Simmons v. United States*, 390 U.S. 377, 394 (1968)); *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) ("[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

have reasonably assumed such a promise was made.  Nor did the agents tell Goddard anything inconsistent with *Miranda* warnings or misrepresent the law.

The first few minutes of Goddard's interview, not unlike many such interviews in the Court's experience, consist of a kind of negotiation on Goddard's part.  Goddard clearly wanted some assurance that his cooperation would be rewarded.  The agents, carefully it seemed, avoided making the commitment Goddard wanted.  Certainly, they acknowledged the possibility of a cooperation agreement.  For example, Agent Pfeiler stated, "You're saying you want us to help you out, and we'd like to do that too.  We can help each other out."  *Id.* at 14:47:15-14:47:23.  The suggestion that cooperation could be beneficial, without a promise of leniency, does not undermine the voluntariness of Goddard's statement.[5]  *See, e.g.*, *Mercer*, 541 F.3d at 1075-76; *Deal*, 438 F. App'x at 811; *Graham*, 323 F. App'x at 800.  The agents also told Goddard that he faced serious charges— "like 30 something counts."  *Id.* at 15:00:44-15:01:25, 15:01:50.  But the agents never sought to induce cooperation from Goddard in exchange for leniency on those charges.  Nor did the agents insinuate they had the ability to grant such leniency.  Instead, the agents resisted Goddard's attempts to get assurances.  Thus, when Goddard, after being asked if he was willing to talk, answered, "If it [is] beneficial, yeah," *Id.* at 14:47:01, the agents responded by simply asking the question again to which

---

[5] In a part of the interview not tendered and thus not admitted into evidence, Goddard, when asked if he would help with a controlled buy of narcotics, responded by asking, "What am I going to get out of the deal?" Doc. 323-2 at 15:39:54.  Agent Pfeiler then stated he was not in a position to say if Goddard cooperated then he would get "x number of years off," but Pfeiler did tell Goddard "for a fact" that if he did cooperate in that way it would be "big" and helpful to him.  *Id.* at 15:39:54 – 15:40:20.  Even if these statements were admitted, they would not undermine the voluntariness of Goddard's statements because Agent Pfeiler merely provided a realistic assessment that Goddard's cooperation would be beneficial and stops short of any promises of leniency.  *See, e.g.*, *Davidson,* 768 F.2d at 1271 (stating that the United States Attorney could recommend a shorter sentence if the defendant would cooperate was not a sufficient inducement to render the defendant's statement involuntary).

Goddard stated, "If ya'll going to help me, yes." *Id.* at 14:47:01-14:47:15. Agent Hurley then replied, "The way this is set up, you're going to have to help yourself . . . that's the only way you can be helped out." *Id.*

As Goddard continued his efforts to extract some definite commitment from the agents, one of the agents arguably slipped a bit when he said: "Alright, this is the deal, as long as you stay in the same sense that you are now, wanting to cooperate, then you're going to be alright." *Id.* at 15:02:36-15:02-:47. Goddard then responded "I know what to do." *Id.* Even standing alone, the statement that Goddard would be "alright" does not amount to a promise of leniency. And considered in the totality of the circumstances, it is clear that the agents never made an express or implied promise of leniency. Certainly, they never said anything suggesting Goddard's statements would not be used against him or anything else conflicting with *Miranda* warnings.

For example, this exchange was followed by Agent Pfeiler telling Goddard "that he was not going back out on the streets." *Id.* at 15:07:40-15:07:45. Goddard then wanted to know if he could at least get bond, and the agent stated that decision was up to a judge. *Id.* at 15:07:52. Goddard even asked if a judge would be lenient on him for being "straight up," but, rather than giving any assurances, Agent Pfeiler stated only that he could not make any promises and that being honest was the best thing Goddard could do. *Id.* at 15:11:00 – 15:11:18. Goddard also sought assurances that his cousin would be released; in response, the agents simply stated Goddard had to concentrate on "helping himself." *Id.* at 14:52:00 – 14:54, 15:00:34 – 15:01:25. Clearly, when viewed in context, the agents did not promise leniency. Rather, Goddard, failing even to

get assurances he would be released on bond, nonetheless voluntarily decided to answer the agents' questions.

In sum, the Court finds that none of the agents' statements, and nothing else in the interview, constitute a promise of leniency and that Goddard's statements, in any event, were not made in reliance on or induced by promises of leniency.

**B.   Deception about Evidence**

Goddard next contends that he was deceived about the evidence against him. In the interview, Agent Hurley implied that he already knew about all of Goddard's criminal activities and specifically stated that he had been "on Goddard's phone." *Id.* at 14:55:49 – 14:54:11. Goddard argues this statement was deceptive and that such a "lie renders a confession involuntary if, either alone or in combination with other factors, it was sufficient to overcome [a defendant's] will." Doc. 326 at 6. First, an officer's misrepresentation of fact, as opposed to a misrepresentation of law, is not "enough to render a suspect's ensuing confession involuntary, nor does it undermine the waiver of the defendant's *Miranda* rights." *Lall*, 607 F.3d at 1285-86; *see also Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (police deceived suspect by falsely stating his cousin had implicated him). Moreover, there is no evidence that Agent Hurley's statement was false. As a result of a wiretap, the Government had collected significant evidence of Goddard's criminal activities, hence Hurley's statement that he had been "on Goddard's phone." Doc. 323-2 at 14:57:09. If Goddard inferred from the agents' statements that they had more evidence than they in fact had, this does not render those statements "lies," much less undermine the voluntariness of his statement. Regardless, the Court

finds that neither Agent Hurley nor Agent Pfeiler's description of the evidence overpowered Goddard's ability to make a free and voluntary statement.

**C.      Influence of Medication**

Goddard sustained a leg injury prior to his custodial interview and, at the time of that interview, he was taking pain medication. Without proof of causation, "the mental condition [of a defendant] alone never disposes of the inquiry into constitutional involuntariness." *Atkins v. Singletary*, 965 F.2d 952, 959 (11th Cir. 1992) (citing *Colorado v. Connelly,* 479 U.S. 157, 164 (1986)); *see also Singleton v. Thigpen*, 847 F.2d 668, 670-671 (11th Cir. 1988). But a defendant's mental state "can be a significant factor when discussing involuntariness." *Atkins*, 965 F.2d at 959; *see also Beecher v. Alabama*, 408 U.S. 234, 236-237 (1972) (considering several factors to conclude a statement was involuntary, including that the defendant was wounded by police, threatened at gunpoint, and under the influence of drugs).

In the interview, Goddard informed the agents that he had taken pain medication and that it may have been affecting him. *Id*. at 14:50:32 – 14:50:39. As Goddard points out, the agents did not inquire into the nature of the medication he had taken. But Agent Pfeiler did ask Goddard if he felt like he could talk to them, and Goddard replied that he could and that he "kn[ew] what was going on." *Id*. And from the video, nothing suggests that Goddard's mental state was impaired. Goddard was able to respond to questions with coherent, lucid responses that showed he understood the questions, the nature of the interview, and the consequences of his answers. Nothing in the interview suggests a mental state that affected the voluntariness of his statement. Indeed, as noted, Goddard unsuccessfully attempted to elicit concessions and assurances from the

agents, suggesting his mental faculties were working fine.  Similarly, Goddard was able to provide detailed accounts of drug and firearms transactions, his role in those transactions, and gang activity in the Milledgeville, Georgia area.  *See generally id*.  He even pointed out to the agents, as if attempting to brag, that he knew he was under investigation because he found tracking devices on his car, which shows not only that his statements were voluntary but that he comprehended the nature of the interview.  *Id*. at 15:10:17.

Accordingly,  the Court finds no evidence that medication or the lack of medication affected Goddard's mental state in any way that undermined the voluntariness of his statements.[6]

**D.     Aggressive Questioning**

Finally, Goddard alleges the agents "used aggressive questioning and intimidation to overbear his will to remain silent."  Doc. 326 at 8.  But after reviewing the interview, the Court easily finds that the agents' questioning was not of the type to overbear Goddard's will.  At the start of the interview, Agent Hurley informed Goddard that he "would not be all in his face," and he was true to his word.  Doc. 323-2 at 14:46:16.  Certainly, the interview was not a casual encounter, but it was conversational for the most part and became heated only briefly when Goddard briefly exhibited

---

[6] In another part of the video not admitted into evidence, Goddard stated that it was difficult for him to keep things straight because of his medication.  Doc. 323-2 at 15:13:15 – 15:13:17.  Later, Goddard mentioned that his medication "has him sweating." *Id*. at 15:33:32.  The agents offered to take a break, but Goddard refused, saying that he wanted "to get this over with." *Id*. at 15:33:46 – 15:33:54.  Finally, Goddard asked a third agent if he could get his pain medication. *Id*. at 15:50:10 – 15:50:17.  The agent responded that someone else would have to answer that question. *Id*.  However, he asked Goddard what medication he was taking and Goddard responded that he takes "like four pills" for pain and blood pressure and, later, stated that he was on antibiotics. *Id*. at 15:50:18 – 15:50:30, 15:56:50 – 15:56:55.  Had these parts of the interview been placed in evidence, the Court's conclusion would have been the same.

frustration. *See, e.g., id*. at 14:52:38 – 14:53:12. Goddard was not subjected to any physical force and no force was threatened. Finally, the interview was relatively short, particularly given the evidence the agents had from the wiretap. For example, Goddard asked for and received water at the beginning of the interview. *Id*. at 14:45:22 . Thus, none of the traditional interrogation tactics or factors that render a statement involuntary are present here. *See Hubbard*, 317 F.3d at 1253; *Waldrop*, 77 F.3d at 1316; *see also Mincey v. Arizona*, 437 U.S. at 398-99; *Purvis*, 932 F.2d at 1421-23.

Accordingly, the Court finds Goddard's will was not overborne by aggressive questioning or interview tactics.

### III. CONCLUSION

Considering the totality of the circumstances, the Court finds that the Government has established, by a preponderance of the evidence, that Goddard, possessing the capability to do so, made an independent and informed choice of his own free will to talk with Agents Hurley and Pfeiler. *Moore*, 856 F.2d at 132. In short, his statements were voluntary. Accordingly, Goddard's motion to suppress (Doc. 282) is **DENIED**.

**SO ORDERED**, this 13th day of April, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT
COURT